**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAWRENCE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ARGUS GROUP HOLDINGS, LLC, | ) | |
| TECHNICAL SOLUTIONS HOLDINGS, | ) | |
| INC., EDGEWATER FUNDS, JZ CAPITAL | ) | |
| PARTNERS LIMITED, GREGORY JONES, | ) | |
| TODD LANSCIONI and BRIAN PEISER, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Lawrence Smith ("Smith"), by his attorneys, James R. Hankle, Esquire Jennifer P. Richnafsky, Esquire and the law firm Sherrard, German & Kelly P.C., as well as Darrell J. Graham, Esquire, Ashley Stump, Esquire and the law firm Roeser, Tanner & Graham, LLC, files this Complaint against the Defendants, Argus Group Holdings, LLC, Technical Solutions Holdings, Inc., Edgewater Funds, JZ Capital Partners Limited, Gregory Jones, Todd Lanscioni and Brian Peiser, as follows:

## PARTIES

1.     Plaintiff Smith is a citizen of Michigan and a former Chief Executive Officer (CEO) and President of Argus Group Holdings, LLC.  Smith is the Holder of a Non-Negotiable Subordinated Note due July 31, 2017 (the "Smith Note") made by Argus Group Holdings, LLC to Smith.

2.      Defendant Argus Group Holdings, LLC ("Argus") is a Delaware Limited Liability Company with its headquarters and its principal place of business at 46400 Continental Drive, in Chesterfield Township, Michigan 48047. Argus holds most of its Board of Directors' meetings in Chicago.

3.      Defendant Technical Solutions Holdings, Inc. ("TSH") is a Delaware corporation with its headquarters in Des Moines, Iowa. TSH holds most of its Board of Directors' meetings in Chicago.

4.      TSH is the majority member of Argus. At all relevant times, TSH has never held less than an 85% ownership interest in Argus and has been the only member of Argus with any voting rights. Those rights include the exclusive right to vote on: (1) the election of Managers to the Management Committee; (2) matters submitted by the Management Committee for approval; and (3) matters required to be submitted for approval under the Operating Agreement, such as the amendment of the Operating Agreement; the merger or consolidation of Argus; and any transition, agreement or action that would contravene the Operating Agreement.

5.      The initial members of Argus's Management Committee – which included Gregory Jones, Todd Lanscioni and Brian Peiser – were all agents or representatives of TSH, JZ Capital Partners Limited and/or Edgewater Funds.

6.      The initial members of Argus made capital contributions totaling $100,000, in proportion to their relative ownership interests.

7.      Edgewater Funds ("Edgewater") is a private equity firm located in Chicago, Illinois.

8.      JZ Capital Partners Limited ("JZ Capital") is a closed-ended investment company incorporated with limited liability under the laws of Guernsey, with offices in New York City, New York and Chicago, Illinois.

9.      From no later than 2012 until approximately October 2020, TSH was wholly owned by Edgewater and JZ Capital.

10.      Upon information and belief, during that entire period, Edgewater and JZ Capital each held approximately 50% of TSH's ownership interests.

11.      In approximately 2020, JZ Capital sold its entire interest in TSH to a secondary fund led by Hamilton Lane Advisors, L.L.C. ("Hamilton Lane")

12.      Upon information and belief, Edgewater and Hamilton Lane each currently holds approximately 50% of TSH's ownership interests.

13.      Defendant Gregory Jones ("Jones") is a Senior Partner at Edgewater, a Director of TSH, and has been a Manager of Argus (as such term is defined in Argus's Operating Agreement) since 2012. Jones also served as a Vice President of Argus beginning in 2012 and directed and/or was involved in fiscal and operational strategy development for Argus. Upon information and belief, Jones resides and/or habitually conducts business in Illinois.

14.      Upon information and belief, Defendant Todd Lanscioni ("Lanscioni") is a Managing Director of JZ Capital, is a Manager of TSH and has been a Manager of Argus (as such term is defined in Argus's Operating Agreement) since 2012. Lanscioni further directed and/or was involved in fiscal and operational strategy development for Argus. Upon information and belief, Lanscioni resides and/or habitually conducts business in Illinois.

15.      Defendant Brian Peiser ("Peiser") is a Partner at Edgewater, is a Manager of TSH and has been a Manager of Argus (as such term is defined in Argus's Operating Agreement) since

2012. Peiser further directed and/or was involved in fiscal and operational strategy development for Argus. Upon information and belief, Peiser resides and/or habitually conducts business in Illinois.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over Defendants because they breached the Smith Note in Illinois, and the Smith Note provides that any action or proceeding to enforce or arising out of the Smith Note may be commenced in a state or federal court in Chicago, Illinois, and the parties consent to jurisdiction and venue in such courts.

17.     Edgewater and JZ Capital are based in and/or have offices in Illinois, and routinely and consistently transact business in Illinois.

18.     Exercising jurisdiction over Argus, TSH, Edgewater and JZ Capital satisfies the due process standards of the U.S. and Illinois Constitutions.

19.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because Defendants are doing business and transacting business within this judicial district and the events giving rise to this lawsuit took place in this judicial district.

20.     The Court has subject matter jurisdiction over Counts III and IV based on federal question jurisdiction as these claims arise under federal law within the meaning of 28 U.S.C. § 1331.

21.     The Court has subject matter jurisdiction over the state law claims based upon supplemental jurisdiction under 28 U.S.C. § 1367, in that the state law claims are so related to Counts III and IV that they form part of the same case or controversy under Article III of the U.S. Constitution.

## FACTUAL ALLEGATIONS

A. **Argus's 2012 Purchase of Argus Group, Inc.**

22.     In July 2012, Argus purchased the assets of Argus Group, Inc. ("AGI") pursuant to an Agreement for Purchase and Sale of Assets of Argus Group, Inc. (the "Purchase Agreement"). Argus was created for purposes of purchasing AGI.

23.     At the time the Purchase Agreement was executed, Smith was the President of AGI and one of its owners.

24.     As set forth in the Operating Agreement of Argus, dated July 31, 2012, Smith became a non-voting member of Argus and initially held a 5.77% ownership interest in Argus. Upon information and belief, between 2012 and 2017, Smith's ownership percentage was recalculated as a result of a series of acquisitions, as well as accounting maneuvers and discussions to which Smith was not privy. Smith did not consent to such recalculation. As a result of such recalculation, Smith's ownership interest in Argus was reduced to less than 1%. (A copy of Argus's Operating Agreement is attached as **Exhibit 1;** *see* **Exhibit A to Exhibit 1**).

25.     In partial consideration for its purchase of AGI, on July 31, 2012, Argus issued to AGI a Non-Negotiable Subordinated Note Due July 31, 2017 in the principal amount of $1,250,000 ("AGI Note"). (A copy of the AGI Note is attached as **Exhibit 2**).

26.     All distributions from the AGI Note were allocated to four minority owners of AGI, including Smith, and those four owners were entitled to receive all payments of principal and interest under the AGI Note.

27.     Lanscioni and Peiser, as well as Scott Brown of Edgewater, negotiated the purchase of AGI on behalf of Argus. Lanscioni and Peiser likewise negotiated the AGI Note (which effectively became the Smith Note) on behalf of Argus.

28. Lanscioni and Peiser, acting on behalf of Defendants, assured Smith and three other owners of AGI that any default of the AGI Note was unlikely since TSH, Edgewater and/or JZ Capital had the means to fund the AGI Note indefinitely.

29. Defendants likewise failed to advise Smith that they intended to load Argus with intercompany debt, then rely on Article 5.2(b) of the AGI Note (which effectively became the Smith Note) to avoid making payments under the AGI Note (which effectively became the Smith Note).

30. To the contrary, Defendants' representations relative to Articles 3 and 5 of the AGI Note focused upon insolvency and reasonably caused Smith to believe that payments would be made under the AGI Note (which effectively became the Smith Note) unless Argus was insolvent.

31. Lanscioni and Pesier, on behalf of Defendants, further misrepresented to Smith that the Smith Note would be paid in 2019 at the latest. Based upon the representations of Lanscioni and Pesier, Smith reasonably believed that Argus's payment obligations to Smith in 2019 were absolute.

32. Further, Defendants specifically avoided discussions during negotiations about the scope and applicability of Article 5.2(b) of the AGI Note (which effectively became the Smith Note).

**B.  The Smith Note.**

33. On April 28, 2014, AGI assigned to Smith and three other former owners of AGI all of its right, title and interest in the AGI Note, and the AGI Note was then cancelled. (A Copy of the Assignment of Subordinated Note is attached as **Exhibit 3**).

34.     Also on April 28, 2014, Argus issued new promissory notes to these former owners of AGI.  These new promissory notes included the Smith Note, which has a principal amount of $721,250. (A copy of the Smith Note is attached as **Exhibit 4**).

35.     Smith owned approximately 20% of the shares of AGI at the time of Argus's acquisition of AGI.  The Smith Note was given in exchange for Smith's sale of his ownership interest in AGI to Argus pursuant to the Purchase Agreement.

36.     At and around the time Smith accepted the Smith Note in exchange for his ownership interest in AGI, Defendants (through Peiser, Lanscioni and Brown) represented to Smith that he would receive the principal and interest set forth in the Smith Note.

37.     The terms of the Smith Note, including Article 5, were substantively identical to the terms of the AGI Note.  Smith therefore reasonably assumed that the representations concerning insolvency and repayment that Defendants had made when negotiating the AGI Note were equally applicable to the Smith Note.

38.     Smith reasonably relied on Defendants' representations and would not have accepted the Smith Note absent Argus's promises to pay him the principal and interest set forth therein.

39.     Smith's reliance on these representations was reasonable.

40.     The Smith Note provides that Argus will pay interest annually at 6% per annum and that the entire outstanding principal amount and all accrued and unpaid interest shall be paid on the Maturity Date.  (Ex. 4 Arts. 1.1, 1.2 (Smith Note)).

41.     The Maturity Date is defined in the Smith Note as follows:

"Maturity Date" means the date that is 120 days following July 31, 2017, subject to extension to a later date as provided by the terms of this Note, but in no event shall such date be extended (whether pursuant to Article III, initiation of the

Blockage Period under <u>Section 5.2</u> or otherwise) to a date later than 120 days following July 31, 2019.

(Ex. 4 at p. 10 (Smith Note)).

42.     Thus, the Smith Note was required to be paid in full by November 28, 2019 at the latest.

43.     The Smith Note provides that Argus could defer annual interest payments and principal payments to the extent that its Free Cash Flow (as defined in the Smith Note) for any year was not sufficient to make such payments.  (Ex. 4 Art. 3.1 (Smith Note)).  However, the deferral of principal payments beyond the Maturity Date could not exceed two years.  (Ex. 4 Art. 3.1 (Smith Note)).

44.     Article 5 of the Smith Note contains certain provisions regarding the subordination of any amounts payable under the Smith Note to Senior Indebtedness and provides that if there has occurred and is continuing a default by Argus in the payment of any Senior Indebtedness, then Argus shall not make any payments on the Note until such default has been cured or waived.  (Ex. 4 Art. 5.2(b), p. 5 (Smith Note)).

45.     Specifically, Article 5.2(b) of the Note provides as follows:

If there has occurred and is continuing a default in the payment of all or any portion of any Senior Indebtedness, unless and until such default shall have been cured or waived, the Company shall not make any payment on or with respect to any Amounts Payable or acquire this Note (or any portion thereof) for cash, property, securities or otherwise.  If an event (not involving the non-payment of any Senior Indebtedness) shall have occurred or, with the giving of notice, or passage of time, or both, would occur, that would allow holders of any Senior Indebtedness to accelerate or otherwise demand the payment thereof, and any holders of Senior Indebtedness give notice of such event to the Company (the date that such notice is received by the company is the "<u>Notice Date</u>"), the Company shall not make any payment on or with respect to any Amounts Payable or acquire the Note (or any portion hereof) for cash, property, securities or otherwise during the period (the "<u>Blockage Period</u>") commencing on the Notice Date and ending on the earlier of (i) two (2) years after the Notice Date if at the end of such two year period such event is not the subject of judicial proceedings and such Senior Indebtedness shall not have been accelerated, (ii) the date such event is cured or waived to the

satisfaction of the holders of the Senior Indebtedness, or (iii) the date the holders of Senior Indebtedness shall have given notice to the Company of the voluntary termination of the Blockage Period…

(Ex. 4 Art. 5.2(b) (Smith Note)).

46.     "Senior Indebtedness" is defined in the Smith Note as follows:

"Senior Indebtedness" shall mean any Indebtedness of the Company (including without limitation, any intercompany Indebtedness), now or hereafter incurred, or any documents executed under or in connection therewith, and any amendments, modifications, deferrals or extensions of such Indebtedness, and any amounts owed in respect of any Indebtedness incurred in refinancing, replacing or refunding the foregoing (including any refinancing, replacing or refunding with new lenders), unless the terms of such Indebtedness expressly provide that such Indebtedness is not Senior Indebtedness with respect to this Note.  Nothing in this Note shall restrict an Affiliate of the Company from being a holder of Senior Indebtedness. Indebtedness owed to Affiliates will be Senior Indebtedness for purposes of this Note.  Notwithstanding anything herein to the contrary, Senior Indebtedness shall include any payables, accrued expenses, fees or other amounts due to an Affiliate of the Company.  Notwithstanding anything herein to the contrary, none of the obligations or liabilities of the Company to the Holder shall be included in Senior Indebtedness.

(Ex. 4 at pp. 10-11 (Smith Note)).

47.     "Indebtedness" is defined in the Smith Note as follows:

"Indebtedness" means the principal, interest (including any interest accruing subsequent to an event specified in Section 4.l(b) or Section 4.l(c) at the rate specified in the applicable contract whether or not a claim for such interest is allowed in any such proceeding or case), premium, if any, fees (including, without limitation, any commitment, agency, facility, structuring, restructuring or other fee) costs, expenses, indemnities and other amounts due on or in connection with any indebtedness (including, without limitation, Senior Indebtedness), whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof) or representing the deferred and unpaid balance of the purchase price of any property (including pursuant to capital leases), and any financial hedging obligations, if and to the extent such indebtedness (other than a financial hedging obligation) would appear as a liability upon a balance sheet of such person or entity prepared on a consolidated basis in accordance with generally accepted accounting principles, other than a trade payable or accrued expense, and also includes, to the extent not otherwise included, the guarantee of items that would be included within this definition as Indebtedness of another person or entity.

(Ex. 4 at p. 10 (Smith Note)).

48.     The Smith Note provides that the "provisions of this Article 5 are made for the benefit of all present and future holders of Senior Indebtedness (and their successors and assigns), and shall be enforceable by them directly against the Holder." (Ex. 4 Art. 5.1 (Smith Note)).

49.     The Smith Note confers other rights on holders of Senior Indebtedness, and obligations on Smith/Holder in respect of the holders of Senior Indebtedness. (*See e.g.*, Ex. 4 Arts. 5.7, 7.4 (Smith Note)).

## C.  Argus's Failure to Pay the Smith Note on or Before the Final Maturity Date.

50.     Argus has made only 1.5 of the required interest payments on the Smith Note and has not made an interest payment for any year after 2013.

51.     Upon information and belief, Argus has purported to defer those payments based on insufficiency of the Argus's Free Cash Flow pursuant to Article 3 of the Smith Note.

52.     The current amount of accrued but unpaid interest exceeds $300,000 on the Smith Note.

53.     Argus did not pay the principal or accrued interest due on the Smith Note at its first Maturity Date of November 28, 2017, which is 120 days after July 31, 2017.

54.     Argus did not provide any written communication to Smith extending the Maturity Date pursuant to Article 3 of the Note.

55.     When Smith inquired why the amounts due to him on November 28, 2017 were not paid, he was told that Argus did not have sufficient Free Cash Flow to make the payment.

56.     From 2012 until 2017, Smith was a member of TSH's Board of Directors. However, in 2017 the CEO of TSH used coercive tactics to convince Smith to sign away his Board privileges.  Specifically, the CEO advised Smith that Smith could stay in the good graces of

Edgewater and JZ Capital – and thereby ensure his continued employment with Argus – only if Smith resigned his Board membership.

57. Even when Smith was a member of TSH's Board of Directors, TSH executives restricted Smith's access to information concerning TSH's investments, financial results and corporate strategy.

58. After Smith resigned his seat on the Board of Directors, Smith lost any ability to obtain information concerning TSH's investments, financial results and corporate strategy, despite the fact that he remained Argus's CEO and President.

59. Argus likewise did not pay the principal and accrued interest due on November 28, 2019, the final Maturity Date by which the Smith Note was required to be paid.

60. Smith initially became concerned about Argus's intent to pay the Smith Note in the spring of 2019, when the Chief Financial Officer of TSH, Christopher Kuhl, advised Smith that certain members of Edgewater management lobbied for TSH not to pay certain promissory notes held by former owners of acquired businesses, including the Smith Note.

61. Kuhl did not mention any possibility of default, and Smith reasonably believed from such discussion that Edgewater was debating whether to pay the Smith Note at all, not whether any alleged default would prevent such payment.

62. In June 2019, in response to inquiries from Smith, Argus acknowledged that the Maturity Date of the Smith Note was November 28, 2019 and represented that the Smith Note would be paid in full when due on November 28, 2019.

63. In communications with Argus in June 2019, Senior Indebtedness – including any alleged indebtedness under the TSH Notes – was not discussed.

64.     Also in or around June 2019, TSH Managers Jones, Lanscioni and Peiser removed Smith as the CEO of Argus.  Smith thereafter stayed on as the President of Argus.

65.     In early November 2019, Smith contacted Peiser regarding the logistics for the upcoming payment of the Smith Note.  Peiser had previously represented to Smith that Argus intended to pay the Smith Note on the Maturity Date.

66.     Receiving no response, six days later Smith sent a follow-up communication regarding payment of the Smith Note to Peiser, Jones and Lanscioni.

67.     Smith similarly did not receive a response to this communication or to several follow-up voicemails.

68.     Finally, on November 26, 2019, two days before the final Maturity Date, Jones delivered a letter to Smith with reference to the AGI Note (not the Smith Note) advising that an event of default had occurred and was continuing under certain Senior Indebtedness and that Argus therefore would not make any payment due under the AGI Note.  (A copy of Jones's letter is attached as **Exhibit 5**).

69.     Defendants used this alleged intercompany debt to avoid payment in November 2019, despite the fact that the definition of "Maturity Date" in the Smith Note expressly provides that "whether pursuant to Article III, initiation of the Blockage Period under Section 5.2 or otherwise," the Maturity Date shall not be extended "to a date later than 120 days following July 31, 2019." (Ex. 4 at p. 10 (Smith Note)).

70.     Jones did not assert in his letter, and Argus has not otherwise provided notice, that any default on Senior Indebtedness prevented Argus from paying the Smith Note.

**D.  The Purported TSH Notes and Intercompany Debt Imposed on Argus.**

71.     The Senior Indebtedness is purportedly intercompany debt owed to TSH.

12

72.     TSH supposedly holds two demand Notes from Argus, one dated November 2, 2012 for $26 million and one dated March 14, 2014 for $10 million (collectively, the "TSH Notes").  (Copies of what Argus represented to be the TSH Notes are attached as **Exhibits 6 and 7**).[1]

73.     Neither of the TSH Notes has any due date.  Rather, both TSH Notes are payable on demand.

74.     TSH purportedly issued a demand for payment of principal and all accrued interest on both TSH Notes by letter dated November 22, 2019, six days before the final Maturity Date of the Smith Note, and four days before providing Smith notice of the same.  (A copy of TSH's November 22, 2019 letter is attached as **Exhibit 8**).

75.     Though the November 22, 2019 letter states that Argus shall be declared in default of the TSH Notes if it does not make payment in full, no such default was apparently declared.

76.     The threatened default under the TSH Notes is a sham, invoked by Argus and TSH at the last minute in a bad faith effort to avoid paying Smith (and, upon information and belief, the other former owners of AGI) the amounts due to them.

77.     Smith was at all relevant times a senior Argus executive, including as of November 22, 2019.

78.     However, until he received the November 22, 2019 letter, Smith was unaware of the TSH Notes, intercompany debt in the purported amounts stated in the November 22, 2019 letter, any draws by Argus under the Notes, any demands for payment of the TSH Notes or any asserted defaults of the TSH Notes.

---

[1] Smith does not allege or concede that the TSH Notes are authentic or legitimate.

79.     Far from threatening default in the years prior to November 2019, TSH, Edgewater and JZ Capital continuously increased the intercompany debt attached to Argus by having Argus borrow money from TSH under the TSH Notes to fund acquisitions of new businesses.

80.     Upon information and belief, in this manner, TSH caused Argus to become an expense vehicle for other acquisitions.

81.     Upon information and belief, most (if not all) of these acquisitions were not made for the benefit of Argus and did not benefit Argus, and the funds used to make these acquisitions were not returned to Argus after the acquisitions were complete.

82.     In contrast, representatives from Edgewater and JZ Capital (Peiser and Lanscioni), informed Smith in 2012 that much of Edgewater's and JZ Capital's yearly income came from acquisitions.

83.     Based on these comments and Smith's experiences with TSH, Edgewater and JZ Capital, it became obvious to Smith that TSH, Edgewater and JZ Capital were in the practice of saddling companies such as Argus with the debts from acquisitions while keeping all the profits from those acquisitions for themselves.

84.     In doing this, TSH, Edgewater and JZ Capital intentionally sought to render promissory notes, including the Smith Note, effectively worthless through the Senior Indebtedness provisions contained therein.

85.     Upon information and belief, it was common practice for TSH, Edgewater and JZ Capital to rely on promissory note vehicles as an alleged means of compensation for owners of an acquired business.

86.     Smith became aware that executives of Edgewater and JZ Capital referred to these promissory notes, such as the Smith Note, as "toilet paper notes."

**E. Smith's Unsuccessful Attempts to Seek Information and Payment After November 2019.**

87.     In December 2019, Smith spoke with Argus's Chief Financial Officer about the alleged threatened default of the TSH Notes.  He advised Smith that he was unaware of a default of the TSH Notes and dismissed any suggestion that TSH would put Argus in default.

88.     That same month, in an effort to better understand Argus's position, Smith sent the first of multiple requests for documents and information to Defendants relative to the alleged Senior Indebtedness and threatened default.

89.     Between December 2019 and August 2020, Smith retained hope that he could work out a resolution with Defendants for payment of at least some portion of the Smith Note and, to that end, attempted to negotiate a resolution with Defendants.

90.     Smith also sent Defendants a formal demand for payment under the Smith Note.

91.     Despite Smith's efforts, Defendants failed to provide Smith with adequate information, rejected Smith's attempts to negotiate a resolution and did not make any payments to Smith.

92.     Instead, Defendants began to threaten Smith with litigation and termination if he continued to seek payment under the Smith Note.

93.     Specifically, in a letter dated June 5, 2020, Defendants told Smith that his attempt to seek the payments to which he was entitled under the Smith Note was a breach of Article 5.2(b) thereof.  (A copy of this letter is attached as **Exhibit 9**).

94.     Defendants reaffirmed these threats of litigation in a letter dated August 20, 2020, in which Defendants informed Smith that they had no obligation to pay the Note or negotiate with him; referred to Smith's attempts to obtain payment after eight years of waiting as a "huge

distraction"; and threatened to terminate Smith's employment for "Cause" if Smith continued his efforts to seek payments under the Smith Note. (A copy of this letter is attached as **Exhibit 10**).

95.     In that August 20, 2020 letter, Defendants also cited an Amended and Restated Credit Agreement (the "Amended Credit Agreement") between TSH and Twin Brook Capital Partners, LLC as a pretext for not paying the Smith Note.

96.     As set forth in heavily redacted, incomplete documents attached to the August 20, 2020 letter, the Amended Credit Agreement is dated as of March 16, 2018, years after Smith accepted the Smith Note, after the initial Maturity Date of the Smith Note, and during the period when Smith was the President and CEO of Argus.

97.     There is no indication from the heavily redacted, incomplete document provided that Argus was a signatory or otherwise consented to the Amended Credit Agreement.

98.     Although Smith was the CEO and/or President of Argus at all relevant times, he had no knowledge and was never informed that TSH was entering into the Amended Credit Agreement or any other agreement that could impact his right to receive payments under the Smith Note. Smith also did not consent to the Amended Credit Agreement.

99.     Defendants at no point mentioned the Amended Credit Agreement as a pretext for failing to make payments on the Smith Note prior to August 2020, even though the Amended Credit Agreement purportedly became effective in March 2018 and Smith and Defendants had been engaged in extensive talks regarding payment of the Smith Note since approximately June 2019.

100.     Defendants' newfound reliance on the Amended Credit Agreement was nothing more than another sham excuse not to pay Smith the money to which he was entitled.

101.     Smith resigned his employment with Argus in June 2021.

102.     As of November 2021, two years had elapsed since the final Maturity Date of the Smith Note and TSH's threatened default of the TSH Notes.

103.     Article 5.2(b) of the Smith Note provided that any Blockage Period would end after two years if, *inter alia*, there were no judicial proceedings and the alleged Senior Indebtedness had not been accelerated.

104.     Upon information and belief, as of November 2021, no default had been declared, there were no judicial proceedings concerning the TSH Notes and the balance of the TSH Notes had not been accelerated.

105.     Accordingly, when the two-year period elapsed in November 2021, it became clear to Smith that Defendants had never intended to pay the Smith Note and, instead, had entered into the Smith Note with the intent of obtaining Smith's ownership interest in AGI for nothing.

**F.  Defendants' Bad Faith Scheme to Avoid Payment of the Smith Note.**

106.     In the eight years that the TSH Notes were purportedly in place, TSH never issued any demand for payment or threatened any default until just days before the Smith Note was due.

107.     As late as June 2019, even though the purported balance on the TSH Notes was then supposedly nearly $39 million, Argus never indicated in discussions between its counsel and Smith's counsel that the TSH Notes were any impediment to Argus paying the Smith Note or that the Smith Note would not be paid in full by the final Maturity Date of November 28, 2019.

108.     In the eight years that the TSH Notes were purportedly in place, Argus failed every single time (a total of over 16 times) to pay the full amount of interest due on each June and December due date.

109. However, rather than demand payment under the TSH Notes or declare a default, TSH simply added the amount of unpaid interest to the principal amount that Argus purportedly owed.

110. Since at least 2015, TSH repeatedly advanced additional sums totaling millions of dollars to Argus under the TSH Notes, until the principal balance on the TSH Notes (per the representations of Argus and TSH) grew to over $40 million.

111. Even after TSH's November 22, 2019 demand and threatened default, TSH advanced additional principal to Argus and simply added that advance to the amount Argus purportedly owed.

112. Upon information and belief, in the almost three years since November 22, 2019, TSH has never demanded or accelerated payment from Argus of the TSH Notes or declared any default.

113. Moreover, TSH, Edgewater and JZ Capital deemed Argus's financial performance to be so strong in 2020 that TSH, Edgewater and JZ Capital approved large bonuses for every member of Argus's leadership team.  Upon information and belief, TSH, Edgewater and JZ Capital would not have approved such bonuses if Argus had been in default of over $40 million of intercompany debt.

114. In short, TSH's November 22, 2019, demand for payment and its threat to declare a default were concocted by Defendants in bad faith, as a pretext to avoid paying the Smith Note.

115. That TSH's excuses were mere pretext is underscored by Defendants' conduct after November 2019, including their persistent refusal to provide Smith with requested information concerning the alleged Senior Indebtedness, and threats of litigation and termination if Smith continued to seek payment under the Smith Note.

116.    TSH abused its discretion as a Holder of Senior Indebtedness under the Smith Note by threatening default solely to avoid Argus paying the Smith Note when finally due.  But for the November 28, 2019 final Maturity Date of the Smith Note, TSH would not have issued any demand for payment and Argus would not have refused to pay the Smith Note.

117.    Defendants acted arbitrarily, capriciously and in a manner inconsistent with the reasonable expectations of the parties to the Smith Note.

118.    Since Gregory Jones's November 26, 2019 letter to Smith, none of the Defendants have notified Smith of the status of the default that Jones threatened.

119.    Smith's counsel has requested on multiple occasions that Defendants' counsel advise of the status of the purported default, but Defendants' counsel did not respond to those requests.

120.    The claimed Senior Indebtedness that purportedly caused TSH to threaten Argus with default of the TSH Notes was purportedly a result of TSH's and Argus's use of intercompany debt to artificially inflate the amount of Senior Indebtedness; TSH's imposition of significant management fees and expenses on Argus; and debt service required to support this intercompany debt (the management fees and expenses and intercompany debt service, both principal and interest, are hereinafter referred to as "Intercompany Payments").

121.    Over the last five years TSH has used the cash flow and earnings of Argus to make substantial Intercompany Payments in an effort to cause Argus to default on the Senior Indebtedness in order to avoid the payment of the Smith Note.

122.    Absent these Intercompany Payments and intercompany debt, Argus would have no difficulty in satisfying its obligation under the Smith Note.  In reality, Argus should have no difficulty satisfying its obligations under the Smith Note, as the threatened default and/or Blockage

Period has been manufactured by the intentional conduct of Argus and TSH relative to Intercompany Payments and intercompany debt.

123.     Under the circumstances, the claimed Senior Indebtedness is more appropriately characterized as equity than debt.

## COUNT I

## BREACH OF CONTRACT
### (Smith v. Argus)

124.     The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

125.     The Smith Note is a valid and enforceable contract.

126.     Argus breached the Smith Note by failing to pay upon the final November 28, 2019 Maturity Date the full amount of principal and interest due.

127.     Argus's breach of the Smith Note is ongoing.  To date, Argus has not paid Smith any of the principal and interest due thereon.

128.     As a result of such ongoing breach, Argus has paid Smith nothing for his ownership interest in AGI.

129.     Moreover, Article 5.2(b) of the Smith Note provides in relevant part that a Blockage Period shall end after two years if the event giving rise to the Blockage Period is not the subject of judicial proceedings and the Senior Indebtedness has not been accelerated, or if TSH has waived the event giving rise to the Blockage Period.

130.     Further, with respect to defaults resulting from alleged nonpayment of Senior Indebtedness, Article 5.2(b) provides that Argus is prevented from making payments under the Smith Note only so long as there is an actual and continuing default that has not been cured or waived.

131.    Upon information and belief, in the nearly three years that have elapsed since November 2019, TSH has never declared any default or otherwise sought to accelerate or demand any payment on the TSH Notes.  To the contrary, upon information and belief, TSH has continued to engage in intercompany debt transactions with Argus, which have had the effect of increasing the amount of purported principal and interest due to TSH under the TSH Notes or otherwise.

132.    Further, upon information and belief, the demand and threatened default that TSH made on November 22, 2019 – nearly three years ago – are not the subject of judicial proceedings.

133.     By its conduct, TSH has waived the purported demand for payment and threatened default.

134.    In addition, Argus breached the implied covenant of good faith and fair dealing.

135.    Argus acted in bad faith when it invoked the Senior Indebtedness provision of the Smith Note in November 2019.

136.    Argus abused its discretion in relying on that provision because no default had been declared on the TSH Notes, and the defaults that TSH threatened were artifices created by TSH and Argus for the purpose of avoiding payment of the Smith Note.

137.    TSH's demand for payment of its Notes and its threat to declare Argus in default of the TSH Notes were pretexts implemented to avoid paying the amounts due to Smith.

138.    By invoking the Senior Indebtedness provisions of the Smith Note and continuing to rely on the Senior Indebtedness provisions to avoid its payment obligations to Smith under the Smith Note, Argus has prevented and destroyed Smith's receipt of any benefits of the Smith Note.

139.    Argus's conduct is inconsistent with and directly contravenes Smith's reasonable expectations that he would receive payment under the Smith Note in exchange for his ownership interest in AGI.

140. Smith has performed all of his obligations under the Smith Note.

141. All conditions precedent to performance under the Smith Note have been satisfied.

142. Argus's breach of the Smith Note has injured Smith in an amount to be determined but exceeding $1,000,000.

## COUNT II

## BREACH OF CONTRACT
## (Smith v. TSH)

143. The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

144. As the purported holder of Senior Indebtedness, TSH is a third-party beneficiary of the Smith Note and is bound by the terms of the contract in the same manner as the parties are bound.

145. The Smith Note is a valid and enforceable contract.

146. TSH breached the Smith Note by abusing its discretion in fabricating a demand for payment of the TSH Notes and threatening to declare defaults on the TSH Notes. Such demands and threats were made solely as a pretext in order to allow Argus to invoke the Senior Indebtedness provisions of the Smith Note and to avoid paying the Smith Note.

147. Moreover, Article 5.2(b) of the Smith Note provides in relevant part that a Blockage Period shall end after two years if the event giving rise to the Blockage Period is not the subject of judicial proceedings and the Senior Indebtedness has not been accelerated, or if TSH has waived the event giving rise to the Blockage Period.

148. Further, with respect to defaults resulting from alleged nonpayment of Senior Indebtedness, Article 5.2(b) provides that Argus is prevented from making payments under the

Smith Note only so long as there is an actual and continuing default that has not been cured or waived.

149.    Upon information and belief, in the nearly three years that have elapsed since November 2019, TSH has never declared any default or otherwise sought to accelerate or demand any payment on the TSH Notes. To the contrary, upon information and belief, TSH has continued to engage in intercompany debt transactions with Argus, which have had the effect of increasing the amount of purported principal and interest due to TSH under the TSH Notes or otherwise.

150.    Further, upon information and belief, the demand and threatened default that TSH made on November 22, 2019 – nearly three years ago – is not the subject of judicial proceedings.

151.     By its conduct, TSH has waived the purported demand for payment and threatened default that led to a Blockage Period under the Smith Note.

152.    By enabling Argus's invocation of the Senior Indebtedness provision of the Smith Note, TSH is responsible for the prevention and destruction of Smith's receipt of any benefits of the Smith Note.

153.    TSH's demand for payment of the TSH Notes and its threat to declare defaults were artifices created for the sole purpose of allowing Argus to avoid paying the Smith Note.

154.    TSH's conduct is inconsistent with and directly contravenes Smith's reasonable expectations that he would receive payment under the Smith Note in exchange for his ownership interest in AGI.

155.    Smith has performed all of his obligations under the Smith Note.

156.    All conditions precedent under the Smith Note have been satisfied.

157.    TSH's breach of the Smith Note has injured Smith in an amount to be determined but exceeding $1,000,000.

## COUNT III

### VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 THEREUNDER
### (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5)
### (Smith v. Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser)

158.    The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

159.    Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser have violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder ("Rule 10b-5"). 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

160.    The Smith Note is a security under the Exchange Act, which defines "security" to include "any note."  15 U.S.C. § 78c(a)(10).

161.    As set forth herein above, Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser falsely represented to Smith that he would receive payment for his ownership interest in AGI under the Smith Note when, in reality, Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser had no intention of compensating Smith for his ownership interests in AGI by making the payments required under the Smith Note.

162.    Further, Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser intentionally neglected to advise Smith that they intended to exploit the Senior Indebtedness provisions of the Smith Note in order to avoid payment obligations to Smith.

163.    To the contrary, Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser represented to Smith that the Smith Note would be paid no later than 2019, and caused Smith to reasonably believe that Argus's payment obligations were absolute.  These representations were manipulative, deceptive and knowingly false.

164.    The facts that Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser misrepresented were material and made with the intent to deceive and defraud Smith and to induce him to accept and not to question the Smith Note.

165.    Receipt of payment for his ownership interest in AGI was a critical, necessary condition of Smith's entry into the Smith Note. But for Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser's promises to compensate Smith for his ownership interest in AGI, Smith would not have agreed to accept the Smith Note.

166.    Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser knew that Smith would rely on these statements in accepting the Smith Note.

167.    Smith did rely on these statements when he agreed to accept the Smith Note in exchange for his ownership interest in AGI.

168.    Smith's reliance on these statements was justified. At the time, Smith was an executive of Argus and had no reason to believe that Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser were attempting to take Smith's ownership interest in AGI without compensation.

169.    Further, Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser actively withheld information from Smith in an effort to disguise, and perpetuate, their fraudulent scheme to usurp the value of the Smith Note and, when Smith attempted to seek information and enforce his right to payment, threatened Smith with litigation and termination of his employment.

170.    Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser acted with scienter because they knew or recklessly disregarded that their statements and omissions to Smith regarding the consideration that Smith would receive for accepting the Smith Note and selling his ownership interest in AGI were materially false and misleading at the time they were made.

171. The subsequent actions of Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser, as well as the terms of the Smith Note concerning Senior Indebtedness, demonstrate Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser's initial knowledge and/or reckless disregard of their statements to Smith.

172. Further, Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser acted with knowledge and/or reckless disregard for the truth and failed or refused to disclose such facts as would reveal the materially false and misleading nature of the statements made, even though such facts were readily available to Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser.

173. Smith discovered Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser's misrepresentations and deceit in the initial offering and provision of the Smith Note in November 2021, after it became clear that Argus was planning to extend the Blockage Period and/or period of non-payment indefinitely without justification.

174. As stated above, Lanscioni and Pesier made the aforementioned misrepresentations to Smith. Lanscioni was an officer, director and/or agent of Argus, JZ Capital and TSH relative to the negotiation of the AGI Note (which effectively became the Smith Note), and was acting on behalf of those entities relative to the transaction. Peiser was an officer, director and/or agent of Argus, TSH and Edgewater relative to the negotiation of the AGI Note (which effectively became the Smith Note), and was acting on behalf of those entities relative to the transaction.

175. These violations and Smith's reasonable reliance on the false statements of Argus, TSH, Edgewater, JZ Capital, Lanscioni and/or Peiser have caused Smith to suffer direct, actual, and consequential damages exceeding $1,000,000.

## COUNT IV

## VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934
## (15 U.S.C. § 78t(a))
## (Smith v. Jones, Lanscioni and Peiser)

176.     The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

177.     Jones and Peiser were control persons of Argus, TSH and Edgewater within the meaning of Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a).

178.     Jones and Peiser exercised actual control over the operations of Argus, TSH and Edgewater relative to the formation of Argus; the negotiation and entry into the AGI Note (which effectively became the Smith Note); and the fraudulent statements, misrepresentations and deceptions detailed in Count III.

179.     Lanscioni was a control person of Argus, TSH and JZ Capital within the meaning of Section 20(a) of the Exchange Act.

180.     Lanscioni exercised actual control over the operations of Argus, TSH and JZ Capital relative to the formation of Argus; the negotiation and entry into the AGI Note (which effectively became the Smith Note); and the fraudulent statements, misrepresentations and deceptions detailed in Count III.

181.     Jones, Lanscioni, and Peiser had the ability to direct (or prevent) the fraudulent statements detailed in Count III.

182.     Jones, Lanscioni, and Peiser acted in bad faith and did directly or indirectly induce the acts constituting the violations detailed in Count III.

183.     By virtue of their status and conduct as control persons, Jones, Lanscioni and Peiser violated Section 20(a) of the Exchange Act.  15 U.S.C. § 78t(a)

184.    These violations have caused Smith to suffer direct, actual, and consequential damages exceeding $1,000,000.

## COUNT V

## COMMON LAW FRAUD
### (Smith v. All Defendants)

185.    The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

186.    As detailed at length herein, the Smith Note was given in consideration for Smith selling his ownership interest in AGI to Argus.

187.    Receipt of payment for his ownership interest in AGI was a critical, necessary condition of Smith's entry into the Smith Note.  But for Defendants' promises to compensate Smith for his ownership interests in AGI, Smith would not have agreed to accept the Smith Note.

188.    Defendants participated in a scheme designed to promote statements of material facts which they knew to be untrue to lure Smith into accepting the Smith Note.

189.     Defendants participated in a scheme to promote the Smith Note in a manner that purposefully and actively avoided the disclosure of information so as to ensure that Smith would accept the Smith Note.

190.    Defendants participated in a scheme designed to coerce Smith into accepting the Smith Note under false and fraudulent pretenses.  Individual Defendants Jones, Lanscioni and Peiser directly participated in and authorized this scheme and made material misrepresentations to Smith.

191.    Defendants intentionally provided false information to Smith as part of a process to coerce Smith into accepting the Smith Note, which would allow Argus to indefinitely avoid paying the principal or accrued interest due on the Smith Note.

192.     Defendants falsely represented to Smith that he would receive payment for his ownership interest in AGI under the Smith Note. Such misrepresentation was material.

193.     Defendants furthered their scheme by allowing TSH to create or manufacture the appearance of Senior Indebtedness to permit Argus to indefinitely avoid paying the principal and accrued interest due on the Smith Note.

194.     Defendants furthered their scheme by threatening Smith with litigation or termination of his employment if he attempted to enforce his right to payment under the Smith Note or continued to question the purported default of the TSH Notes.

195.     Upon information and belief, the sum value of the purported Senior Indebtedness is at least $40 million. That value was created through a fraudulent scheme designed to allow Argus to indefinitely avoid paying the principal or accrued interest due on the Smith Note to Smith's detriment and to the benefit of Argus and TSH.

196.     In failing to apprise Smith of their true scheme and in failing to provide Smith with valuable information, including information related to the creation of Senior Indebtedness by TSH and its concocted threats of default, Defendants perpetrated a fraud designed to coerce Smith, under duress and false pretenses, into accepting extensions for the payment of the principal or accrued interest due on the Smith Note to Smith's detriment and to the benefit of Defendants.

197.     By advising Smith that an event of default had occurred and was continuing under certain Senior Indebtedness in reference to the AGI Note (not the Smith Note), Defendants made material misrepresentations.

198.     Defendants further misrepresented that an actual default had been declared by TSH against Argus.

199. Defendants knew that each of these statements were false at the time they were made, as over the last five years TSH has used the cash flow and earnings of Argus to make substantial Intercompany Payments in an effort to cause Argus to default on the Senior Indebtedness in order to avoid the payment of the Smith Note, and absent these Intercompany Payments and intercompany debt, Argus would have had no difficulty in satisfying its obligations under the Smith Note.

200. Further, since at least 2015, TSH repeatedly advanced additional sums totaling millions of dollars to Argus under the TSH Notes, until the principal balance on the TSH Notes grew to over $40 million.

201. To date, upon information and belief, TSH has not declared any default of the Smith Note, accelerated any payments under the Smith Note, or demanded the payment of any principal or interest purportedly due under the Smith Note.

202. Each of these aforementioned statements were material in nature and made with the intent to deceive and defraud Smith and to induce him to accept the Smith Note.

203. Defendants knew that Smith would, and in fact did, rely on these statements in accepting the Smith Note.

204. Smith's reliance on these statements was justified, as Defendants actively withheld information from him in an effort to disguise, and perpetuate, their fraudulent scheme to usurp the value of the Smith Note.

205. The conduct of Defendants was done willfully, intentionally, recklessly and/or in bad faith.

206.     As a result of these violations and Smith's reasonable reliance on the false statements of Defendants, Smith has suffered direct, actual, punitive and consequential damages exceeding $1,000,000.

## COUNT VI

## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*)
### (Smith v. All Defendants)

207.     The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

208.     The Illinois Consumer Fraud and Deceptive Practices Act ("ICPA") prohibits:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS § 505/2.

209.     The purpose of the ICPA is "to protect consumers, borrowers and businessmen against fraud and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Lyne v. Arthur Andersen & Co.*, 772 F. Supp. 1064, 1067-68 (N.D. Ill. 1991) (citations omitted).

210.     As a businessman, Smith falls within the categories of persons that the ICPA is intended to protect.

211.     As detailed at length herein, Defendants engaged in unfair deceptive acts and practices prohibited under the ICPA.

212. The unfair deceptive acts and practices occurred in Illinois.

213. The Smith Note was given in consideration for Smith selling his ownership interest in AGI to Argus.

214. Receipt of payment for his ownership interest in AGI was a critical, necessary condition of Smith's acceptance of the Smith Note.

215. Defendants deceived Smith into believing that Smith would be compensated for his ownership interests in AGI through Defendants' payment of principal and interest under the Smith Note.

216. But for Defendants' promises to compensate Smith for his ownership interests in AGI, Smith would not have agreed to accept the Smith Note.

217. Defendants made statements of material facts which they knew to be untrue to lure Smith into accepting the Smith Note.

218. Defendants purposefully and actively avoided the disclosure of information so as to ensure that Smith would accept the Smith Note.

219. Defendants deceived Smith into accepting the Smith Note under false and fraudulent pretenses. Individual Defendants Jones, Lanscioni and Peiser directly participated in and authorized this deception and made material misrepresentations to Smith.

220. Defendants intentionally provided false information to Smith as part of a process to coerce Smith into accepting the Smith Note, which would allow Argus to indefinitely avoid paying the principal or accrued interest due on the Smith Note.

221. Defendants falsely represented to Smith that he would receive payment for his ownership interest in AGI under the Smith Note. Such misrepresentation was material.

222.    Defendants furthered their fraud and deception by allowing TSH to create or manufacture the appearance of Senior Indebtedness to permit Argus to indefinitely avoid paying the principal and accrued interest due on the Smith Note.

223.    Defendants additionally engaged in unfair and deceptive conduct by threatening Smith with litigation or termination of his employment if he attempted to enforce his right to payment under the Smith Note or continued to question the purported default of the TSH Notes.

224.    Upon information and belief, the sum value of the purported Senior Indebtedness is at least $40 million.  That value was created through a fraudulent scheme designed to allow Argus to indefinitely avoid paying the principal or accrued interest due on the Smith Note to Smith's detriment and to the benefit of Argus and TSH.

225.    In failing to apprise Smith of their true intent and in failing to provide Smith with valuable information, including information related to the creation of Senior Indebtedness by TSH and its concocted threats of default, Defendants perpetrated a fraud designed to coerce Smith, under duress and false pretenses, into accepting extensions for the payment of the principal or accrued interest due on the Smith Note to Smith's detriment and to the benefit of Defendants.

226.    By advising Smith that an event of default had occurred and was continuing under certain Senior Indebtedness in reference to the AGI Note (not the Smith Note), Defendants made material misrepresentations.

227.    Defendants further misrepresented that an actual default had been declared by TSH against Argus.

228.    Defendants knew that each of these statements were false at the time they were made, as over the last five years TSH has used the cash flow and earnings of Argus to make substantial Intercompany Payments in an effort to cause Argus to default on the Senior

Indebtedness in order to avoid the payment of the Smith Note, and absent these Intercompany Payments and intercompany debt, Argus would have had no difficulty in satisfying its obligations under the Smith Note.

229.     Further, since at least 2015, TSH repeatedly advanced additional sums totaling millions of dollars to Argus under the TSH Notes, until the principal balance on the TSH Notes grew to over $40 million.

230.     To date, upon information and belief, TSH has not declared any default of the Smith Note, accelerated any payments under the Smith Note, or demanded the payment of any principal or interest purportedly due under the Smith Note.

231.     Each of these aforementioned statements were material in nature and made with the intent to deceive and defraud Smith and to induce him to accept the Smith Note and to avoid payments under the Smith Note.

232.     Smith did rely on Defendants' fraud, deceptive conduct and material misstatements.

233.     The deceptive and unfair acts and practices occurred in a course of conduct involving trade or commerce.

234.     The conduct of Defendants was done willfully, intentionally, recklessly and/or in bad faith.

235.     Defendants' unfair and deceptive conduct have proximately caused Smith to suffer direct, actual, punitive and consequential damages exceeding $1,000,000.

236.     Smith is further entitled to an award of attorneys' fees and costs, as set forth in 815 ILCS § 505/10a(c).

## COUNT VII

## CIVIL CONSPIRACY
### (Smith v. All Defendants)

237.    The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

238.    By virtue of the conduct set forth in Paragraphs 22-32, 50-123 above, Defendants conspired in a scheme to defraud Smith by usurping the value of the Smith Note and seizing Smith's ownership interest in AGI without compensation to Smith.

239.    Defendants' scheme to defraud Smith by usurping the value of the Smith Note and seizing Smith's ownership interest in AGI without compensation to Smith was unlawful.

240.    Defendants collectively agreed to participate in this scheme.

241.    As set forth more fully herein above, Defendants performed the following overt acts pursuant to and in furtherance of their common scheme to defraud Smith by usurping the value of the Smith Note and seizing Smith's ownership interest in AGI without compensation to Smith:

(a)     Lanscioni and Peiser, as the representatives of Argus, TSH, Edgewater and JZ Capital who negotiated the AGI Note (which effectively became the Smith Note), avoided discussions during negotiations about Article 5.2(b) of the AGI Note (which effectively became the Smith Note), and made false representations that caused Smith to reasonably believe that: (1) any default of the AGI Note (and subsequently, the Smith Note) was unlikely based on TSH's, Edgewater's and/or JZ Capital's ability to fund those Notes indefinitely; (2) that payments would be made under the AGI Note (and subsequently, the Smith Note) unless Argus was insolvent; and (3) that Smith would receive payment under the Smith Note no later than 2019 and that Argus's obligation to pay in 2019 was absolute;

(b)     Defendants intentionally did not advise Smith that they intended to exploit the Senior Indebtedness provisions of the Smith Note in order to avoid payment obligations to Smith;

(c)     Defendants falsely represented to Smith that he would receive payment for his ownership interest in AGI under the Smith Note when, in reality, Defendants had no intention of compensating Smith for his ownership interests in AGI by making the payments required under the Smith Note;

35

(d)     Lanscioni and Peiser, as representatives of Argus, TSH, JZ Capital and Edgewater, falsely represented to Smith that Argus intended to pay the Smith Note on the final Maturity Date of November 28, 2019, when they had no intention of making such payment;

(e)     In an effort to avoid paying the Smith Note, Edgewater, TSH and Argus, with the participation and authorization of high-level executives Peiser, Lanscioni and Jones, falsely represented that an event of default had occurred and was continuing under the TSH Notes, when in fact, no default was ever declared and, to the contrary, TSH continued to advance sums to Argus under the TSH Notes;

(f)     Upon information and belief, in an attempt to avoid payment to Smith under the Smith Note and to render the Smith Note effectively worthless, TSH, Edgewater and JZ Capital, with the participation and authorization of high-level executives Peiser, Lanscioni and Jones, caused Argus to become an expense vehicle for acquisitions that did not benefit Argus, such that Argus became saddled with the debt from acquisitions while TSH, Edgewater and JZ Capital kept any profits from such acquisitions; and

(g)     After the final Maturity Date of the Smith Note, Defendants, with the participation and authorization of high-level executives Peiser, Lanscioni and Jones, continued their fraudulent scheme by failing to provide Smith with requested books and records to which he was entitled, as well as threatening Smith with litigation and the termination of his employment if Smith sought to enforce his rights to payment under the Smith Note.

242.    Defendants' overt acts, as set in Paragraph 241 and more fully in Paragraphs 22-32, 50-123 herein above, have caused Smith to suffer direct, actual, punitive and consequential damages exceeding $1,000,000.

## COUNT VIII

### BREACH OF FIDUCIARY DUTIES
### (Smith v. TSH)

243.    The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

244.    Since 2012, Smith has been a member of Argus with a minority ownership interest.

245.    At all relevant times, TSH has been a member of Argus holding a majority (at least 85%) of Argus's ownership interests.

246.    At all relevant times, TSH has been the only member of Argus with any voting rights and has had the sole and exclusive authority to appoint Managers to Argus's Management Committee.

247.    As the majority member of Argus and the sole member of Argus with authority to appoint members of the Management Committee and vote on matters pertinent to the business and operations of Argus, TSH owes fiduciary duties to Smith and the other minority members of Argus. *See* 805 ILCS 180/15-3(g)(1), (3).

248.    By reason of such fiduciary relationship, TSH owes a duty of loyalty to Smith, including a duty to act fairly to Smith relative to Smith's dealings with Argus. *See* 805 ILCS 180/15-3(b)(2).

249.    By reason of such fiduciary relationship, TSH owes a duty of care to Smith relative to the conduct of Argus's business and shall not engage in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law. *See* 805 ILCS 180/15-3(c).

250.    By reason of such fiduciary relationship, TSH owes a duty of good faith and fair dealing to Smith. *See* 805 ILCS 180/15-3(d).

251.    As more fully alleged herein above, TSH breached its fiduciary duties to Smith by saddling Argus with intercompany debt used to fund acquisitions that did not benefit Argus, failing to return funds to Argus once the acquisitions were complete, then citing that same intercompany debt as a purported basis for not paying the Smith Note.

252.     As more fully alleged herein above, TSH breached its fiduciary duties to Smith by engaging in a scheme to defraud Smith by usurping the value of the Smith Note and seizing Smith's ownership interests in AGI without compensation to Smith.

253.     As more fully alleged herein, TSH breached its fiduciary duties to Smith by conspiring with Argus, Edgewater and JZ Capital to threaten Argus with a default under the TSH Notes, when in reality, such threats were mere pretext to avoid payment of the Smith Note, and no default was ever declared.

254.     As more fully alleged herein, TSH has breached its fiduciary duties to Smith by exploiting its powers as the majority member of Argus, and the sole member with any voting or appointment power, to prevent Smith, a minority member, from receiving payments owed to him under the Smith Note.

255.     TSH's breaches of its fiduciary duties were willful, intentional, reckless, grossly negligent, in bad faith and/or done without due regard for Smith's interests as a minority member of Argus.

256.     As a result of TSH's breaches of its fiduciary duties to Smith, Smith has suffered direct, actual, punitive and consequential damages exceeding $1,000,000.

## COUNT IX

### BREACH OF FIDUCIARY DUTIES
### (Smith v. Jones, Lanscioni and Peiser)

257.     The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

258.     Since 2012, Smith has been a member of Argus with a minority ownership interest.

259.   As set forth in Argus's Operating Agreement, Jones, Lanscioni and Peiser are Managers of Argus.  Argus is a manager-managed limited liability company, subject to the rights and authorities granted to TSH as stated above.

260.   Upon information and belief, Jones, Lanscioni and Peiser have remained Managers of Argus at all times relevant hereto.

261.   As Managers of a manager-managed limited liability company, Jones, Lanscioni and Peiser owe fiduciary duties to Smith and the other minority members of Argus.  *See* 805 ILCS 180/15-3(g)(2).

262.   By reason of such fiduciary relationship, Jones, Lanscioni and Peiser owe a duty of loyalty to Smith, including a duty to act fairly to Smith relative to Smith's dealings with Argus. *See* 805 ILCS 180/15-3(b)(2).

263.   By reason of such fiduciary relationship, Jones, Lanscioni and Peiser owe a duty of care to Smith relative to the conduct of Argus's business and shall not engage in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.  *See* 805 ILCS 180/15-3(c).

264.   By reason of such fiduciary relationship, Jones, Lanscioni and Peiser owe a duty of good faith and fair dealing to Smith.  *See* 805 ILCS 180/15-3(d).

265.   As more fully alleged herein above, Jones, Lanscioni and Peiser breached their fiduciary duties to Smith by engaging in a scheme to defraud Smith by usurping the value of the Smith Note and seizing Smith's ownership interests in AGI without compensation to Smith.

266.   As more fully alleged herein, Jones, Lanscioni and Peiser breached their fiduciary duties to Smith by conspiring with Argus, Edgewater and JZ Capital to threaten Argus with a

default under the TSH Notes, when in reality, such threats were mere pretext to avoid payment of the Smith Note and no default was ever declared.

267.    As more fully alleged herein, Jones, Lanscioni and Peiser breached their fiduciary duties to Smith by exploiting their powers as Managers of a manager-managed liability company in which Smith was a minority member without voting or managerial rights, to seize Smith's ownership interests in AGI and usurp the value of the Smith Note.

268.    Jones', Lanscioni's and Peiser's breaches of their fiduciary duties were willful, intentional, reckless, grossly negligent, in bad faith and/or done without due regard for Smith's interests as a minority member of Argus.

269.    As a result of Jones's, Lanscioni's and Peiser's breaches of their fiduciary duties to Smith, Smith has suffered direct, actual, punitive and consequential damages exceeding $1,000,000.

## COUNT X
### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES
### (Smith v. Edgewater and JZ Capital)

270.    The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

271.    TSH, Jones, Lanscioni and Peiser all owed fiduciary duties to Smith to act in good faith, as well as duties of loyalty and care to Smith relative to Smith's dealings with Argus and the conduct of Argus's business.

272.    By virtue of the conduct set forth in Paragraphs 22-32 and 50-123, as well as Counts VII and VIII above, TSH, Jones, Lanscioni and Peiser breached their fiduciary duties to Smith, which included engaging in a scheme to harm Smith, a minority member of Argus, by usurping

the value of the Smith Note and seizing Smith's ownership interests in AGI without compensation to Smith.

273.    Edgewater and JZ Capital knowingly and substantially assisted TSH, Jones, Lanscioni and Peiser's breaches of fiduciary duties by: (i) causing TSH and their high-level employees, Jones, Lanscioni and Peiser, to fabricate threatened defaults of intercompany debt; (ii) repeatedly rejecting Smith's attempts to seek documentation and value for his ownership interest in AGI; (iii) structuring, orchestrating and/or engaging in acquisitions using vehicles that saddled Argus with intercompany debt and, in so doing, harmed minority members of Argus such as Smith; and (iv) approving attempts to usurp the value of the Smith Note and seize Smith's ownership interest in AGI without compensation.

274.    Edgewater and JZ Capital were not passive beneficiaries of unlawful conduct by TSH, Jones, Lanscioni and Peiser; they were active participants and co-conspirators.   Jones, Lanscioni and Peiser were agents and high-level employees of Edgewater and/or JZ Capital.

275.    Edgewater and JZ Capital were regularly aware that they were facilitating and assisting TSH, Jones, Lanscioni and Peiser's breaches of fiduciary duties at the time of such breaches.

276.    In aiding and abetting others' breaches of fiduciary duty, Edgewater and JZ Capital acted willfully, wantonly, and in reckless disregard of Smith's interests.

277.    Edgewater's and JZ Capital's aiding and abetting breaches of fiduciary duty have caused Smith to suffer direct, actual, punitive and consequential damages exceeding $1,000,000.

## COUNT XI

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP/
### SMITH NOTE
### (Smith v. TSH, Edgewater, JZ Capital, Lanscioni, Peiser and Jones)

278.     The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

279.     By virtue of the conduct set forth in Paragraphs 22-32, 50-123 above, TSH, Edgewater, JZ Capital, Lanscioni, Peiser and Jones tortiously interfered with the contractual relationship between Argus and Smith and, specifically, the performance of Argus's contractual obligations under the Smith Note.

280.     The Smith Note was a valid and enforceable agreement between Smith and Argus.

281.     TSH, Edgewater, JZ Capital, Lanscioni, Peiser and Jones knew of the Smith Note.

282.     As detailed in Paragraphs 22-32, 50-123 above, TSH, Edgewater, JZ Capital, Lanscioni, Peiser and Jones intentionally and unjustifiably induced Argus to breach the contract by: (i) fabricating intercompany debt that did not benefit Argus; (ii) threatening a sham default of such intercompany indebtedness in order to avoid payment of the Smith Note; (iii) failing to provide Smith with documentation relative to the alleged intercompany indebtedness to which he was entitled; and (iv) threatening Smith with termination and legal action if he sought to enforce his contractual right to payment under the Smith Note.

283.     Lanscioni, Peiser and Jones directly authorized and/or participated in this wrongful conduct.

284.     TSH, Edgewater, JZ Capital, Lanscioni, Peiser and Jones's wrongful conduct caused Argus to breach the Smith Note.

285.     As a result of TSH, Edgewater, JZ Capital, Lanscioni, Peiser and/or Jones's tortious interference with the contractual relationship between Smith and Argus, Smith has suffered direct, actual, punitive and consequential damages exceeding $1,000,000.

**COUNT XII**

**PARTIAL RESCISSION OF PURCHASE AGREEMENT/SMITH NOTE**
**(Smith v. Argus)**

286.     The averments contained in the preceding paragraphs are hereby expressly incorporated as though set forth more fully at length herein.

287.     As stated above, the Smith Note was supposed to be in consideration for Smith selling his ownership interest in AGI to Argus, but Argus's promise to pay under the Smith Note was illusory and a sham.

288.     Argus completely eviscerated its promise and obligation to pay under the Smith Note through exploitation of the Senior Indebtedness and Free Cash Flow provisions of the Smith Note.

289.     Upon information and belief, Argus insisted that those provisions be included in the Smith Note.

290.     Those provisions assured Argus that it could decide, in its unilateral discretion, whether or not to make any payments under the Smith Note.

291.     Worse, those provisions enabled Argus and its affiliates to act in bad faith to create the pretext of default on Senior Indebtedness in order to avoid paying the Smith Note when due.

292.     Through unilateral conduct and reliance on the Free Cash Flow and Senior Indebtedness provisions of the Smith Note, Argus manufactured circumstances intended to remove all of its performance obligations under the Smith Note.

293.    Namely, Argus manufactured circumstances that enabled it to obtain and retain Smith's ownership in AGI, and the other benefits and obligations provided by Smith under the Purchase Agreement, for nothing.

294.    This conduct on the part of Argus constituted substantial nonperformance under and breach of the Smith Note.

295.    Further, this gross disparity in the values exchanged shocks the conscience.

296.    Smith would not have accepted or agreed to enter into the Smith Note had he known that he would ultimately receive nothing for his ownership interest in AGI.

297.    Argus's failure to pay the Smith Note on its final Maturity Date is of such a nature and of such importance that the consideration for Smith's sale of his interest in AGI fails, Smith's sale of his ownership interest in AGI to Argus should be rescinded, and Smith's ownership interest in AGI should be restored by awarding him an equal and commensurate interest in Argus.

298.    In this manner, the parties can be restored to the status quo *ante*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.    Enter judgment in favor of Smith and against Argus for breach of the Smith Note in an amount to be determined but exceeding $1,000,000;

B.    Enter judgment in favor of Smith and against TSH for breach of the Smith Note in an amount to be determined but exceeding $1,000,000;

C.    Enter judgment in favor of Smith and against Argus, TSH, Edgewater, JZ Capital, Lanscioni and Peiser for violation of Section 10(b) of the Exchange Act and Rule 10b-5, with damages in an amount to be determined but exceeding $1,000,000;

D.     Enter judgment in favor of Smith and against Jones, Lanscioni and Peiser for violation of Section 20(a) of the Exchange Act, with damages in an amount to be determined but exceeding $1,000,000;

E.     Enter judgment in favor of Smith and against Argus, TSH, Edgewater, JZ Capital, Jones, Lanscioni and Peiser for common law fraud, with damages in an amount to be determined but exceeding $1,000,000;

F.     Enter judgment in favor of Smith and against Argus, TSH, Edgewater, JZ Capital, Jones, Lanscioni and Peiser for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*, with damages in an amount to be determined but exceeding $1,000,000, plus all recoverable costs, interest and attorneys' fees;

G.     Enter judgment in favor of Smith and against Argus, TSH, Edgewater, JZ Capital, Jones, Peiser and Lanscioni for civil conspiracy, with damages in an amount to be determined but exceeding $1,000,000;

H.     Enter judgment in favor of Smith and against TSH for breach of fiduciary duties, with damages in an amount to be determined but exceeding $1,000,000;

I.     Enter judgment in favor of Smith and against Jones, Lanscioni and Peiser for breach of fiduciary duties, with damages in an amount to be determined but exceeding $1,000,000;

J.     Enter judgment in favor of Smith and against Edgewater and JZ Capital for aiding and abetting breaches of fiduciary duties, with damages in an amount to be determined but exceeding $1,000,000;

K.     Enter judgment in favor of Smith and against TSH, Edgewater, JZ Capital, Peiser, Lanscioni and Jones for tortious interference with contractual relationships, with damages in an amount to be determined but exceeding $1,000,000;

L.     Enter judgment in favor of Smith rescinding the sale of Smith's ownership interest in AGI to Argus and awarding Smith an equal and commensurate interest in Argus;

M.     Award Smith punitive damages;

N.     Award Smith his reasonable attorneys' fees and costs; and

O.     Award such other and further relief as is appropriate.

## **JURY DEMAND**

Plaintiff demands trial by jury.

Dated: November 2, 2022                          Respectfully submitted,

                                                 */s/ Darrell J. Graham*
                                                 Darrell J. Graham, Esquire
                                                 Email: dgraham@rtglaw.com

                                                 Ashley Stump, Esquire
                                                 Email: ashley.stump@rtglaw.com

                                                 Roeser, Tanner & Graham, LLC
                                                 Two N. Riverside Plaza, Ste. 1850
                                                 Chicago, IL 60606
                                                 (312) 621-0301


                                                 and

                                                 James R. Hankle, Esquire
                                                 PA I D. No. 36019
                                                 Email:jrh@sgkpc.com

                                                 Jennifer P. Richnafsky, Esquire
                                                 PA I.D. No. 314764
                                                 Email:jpr@sgkpc.com

                                                 Sherrard, German & Kelly, P.C.
                                                 The Oliver Building
                                                 535 Smithfield Street, Suite 300
                                                 Pittsburgh, PA 15222

(412) 355-0200

*Attorneys for Plaintiff Lawrence Smith*

*(Pro Hac Vice Admission Pending)*